# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| SEAN T. WILEY, | ) |
| Plaintiff, | ) |
| | ) Case No. 13 C 3637 |
| v. | ) |
| PATRICK PEREZ, et al., | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

On June 25, 2014, pro se Plaintiff Sean T. Wiley, a federal inmate who was held in the Kane County Adult Justice Center during the relevant time period, filed an Amended Complaint alleging Eighth Amendment violations. *See* 42 U.S.C. § 1983. Before the Court are Defendants' motions for summary judgment pursuant to Federal Rule of Civil Procedure 56(a). For the following reasons, the Court grants Defendants' summary judgment motions because Plaintiff has failed to exhaust his administrative remedies.

## BACKGROUND

### I.  Northern District of Illinois Local Rule 56.1

Because Plaintiff is a pro se litigant, Defendants served him with a "Notice to Pro Se Litigant Opposing Motion for Summary Judgment" as required by Northern District of Illinois Local Rule 56.2. The notice explains the consequences of failing to properly respond to a motion for summary judgment and statement of material facts under Federal Rule of Civil Procedure and Local Rule 56.1.

Local Rule 56.1 "is designed, in part, to aid the district court, 'which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information,' in determining whether a trial is necessary." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (citation omitted). Local Rule 56.1(a)(3) requires the moving party to provide "a statement of material facts as to which the moving party contends there is no genuine issue." *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). "The opposing party is required to file 'a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." *Id.* (citing N.D. Ill. R. 56.1(b)(3)(B)). Local Rule 56. 1(b)(3)(C) requires the nonmoving party to present a separate statement of additional facts that requires the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon to support the statement of additional facts. *See Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 643-44 (7th Cir. 2008).

In general, the purpose of Local Rule 56.1 statements and responses is to identify the relevant admissible evidence supporting the material facts, not to make factual or legal arguments. *See Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006) ("statement of material facts did [ ] not comply with Rule 56.1 as it failed to adequately cite the record and was filled with irrelevant information, legal arguments, and conjecture"). "When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by the rule, those facts are deemed admitted for purposes of the motion." *Cracco*, 559 F.3d at 632; *see also Frey Corp. v. City of Peoria, Ill.*, 735 F.3d 505, 513 (7th Cir. 2013). In

addition, district courts, in their discretion, may "choose[] to ignore and not consider the additional facts that a litigant has proposed" if the litigant failed to comply with Local Rule 56.1. *Cichon v. Coop. Plus, Inc.*, 401 F.3d 803, 809-10 (7th Cir. 2005) (citing *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1316 (7th Cir. 1995)).

In sum, "[f]or litigants appearing in the Northern District of Illinois, the Rule 56.1 statement is a critical, and required, component of a litigant's response to a motion for summary judgment. The purpose of the local rule is to make the summary judgment process less burdensome on district courts, by requiring the parties to nail down the relevant facts and the way they propose to support them." *Sojka v. Bovis Lend Lease, Inc.*, 686 F.3d 394, 398 (7th Cir. 2012).

Courts must construe pro se pleadings liberally, *see Ambrose v. Roeckeman*, 749 F.3d 615, 618 (7th Cir. 2014), but a plaintiff's pro se status does not absolve him from complying with the federal and local procedural rules. *See Pearle Vision, Inc. v. Romm,* 541 F.3d 751, 758 (7th Cir. 2008); *Greer v. Board of Ed. of City of Chicago*, 267 F.3d 723, 727 (7th Cir. 2001). As the Supreme Court instructs, "we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel." *McNeil v. United States,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993).

Plaintiff responded to the motions for summary judgment with a memorandum in opposition to the motions and a statement of additional facts that requires the denial of summary judgment. Plaintiff did not respond to either of the movants' statement of material facts. As such, the Court accepts all properly supported assertions in Defendants' statements of material facts at true to the extent that the facts are supported in the record. *See* L.R. 56.1(b)(3)(C); *Apex*

*Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013); *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012).

As to Plaintiff's statement of additional facts, Plaintiff failed to reference any affidavits, parts of the record, or other supporting materials upon which he relies in support of his statement of additional facts for all but six of his additional facts. (R. 71 ¶¶ 1-74.) The Court disregards the Plaintiff's additional facts that lack citation to the record or that contain improper legal arguments. (*See id.* ¶¶ 1-4, 6-38, 41-58, 60-63, 64[b], 65[b], 67-73 [Plaintiff included some additional statements with the same number, i.e., 64, 65].)

In addition, the Court is not required to scour the record looking for factual disputes nor is the Court required to piece together Plaintiff's arguments for him. *See Diadenko v. Folino*, 741 F.3d 751, 757 (7th Cir. 2013); *see also Herman v. City of Chicago*, 870 F.2d 400, 404 (7th Cir. 1989) ("A district court need not scour the record to make the case of a party who does nothing."). Plaintiff's failure to comply with Local Rule 56.1, however, does not result in an automatic grant of summary judgment in favor of Defendants. Instead, the Court still must evaluate all facts in the light most favorable to him, the non-moving party. *See* Fed. R. Civ, P. 56(e)(2); *Keeton*, 667 F.3d at 884. With these standards in mind, the Court turns to the relevant facts of this case.

## II.     Relevant Facts

### A.     Parties

At all relevant times, Plaintiff Sean Wiley was a federal inmate held in the Kane County Adult Justice Center ("Jail"). (R. 53 ¶ 1.) Jail personnel admitted Wiley to the Jail on May 15, 2012, and released Wiley to the U.S. Marshals on July 24, 2013. (*Id.* ¶ 2.) Defendant Patrick

Perez is the elected Sheriff of Kane County, Illinois, and has the responsibility of overseeing and maintaining the operations of the Jail. (*Id.* ¶ 3.) Defendant Corey Hunger is the Commander of Corrections of the Jail and is responsible for overseeing the operations of the Jail. (*Id.* ¶ 4.) Defendant Sergeant Donald Smith served as the Assistant Commander on the Corrections Response Team ("CRT") at the Jail from 2003 until the spring of 2013. (R. 57 ¶¶ 2-3.) As Assistant Commander of CRT, Smith was responsible for overseeing each mission to completion. (*Id.* ¶ 3.) Smith would receive orders from the Commander of CRT and would brief the team and establish how to accomplish the task. (*Id.*)

B.     The June 11, 2012, Incident

On June 11, 2012, at approximately 11:20 a.m., Wiley waived his hands at Correctional Officer Jacob Watson and asked him to change the channel of the television in E-Pod. (*Id.* ¶ 32.) When Watson approached Wiley's cell, a verbal altercation ensued. (*Id.*) A short time later, at approximately 12:38 a.m., Watson re-approached Wiley's cell as Wiley yelled through his cell door. (*Id.* ¶ 33.) Wiley stated that "you're going to have to call in everybody if you think you're moving me." (*Id.*) Watson called the Classification Sergeant to see if there was a spot available on red status in F-Pod. (*Id.*) Shortly thereafter, Watson and other correctional officers advised Wiley to place his hands through the cell chuck hole so that they could handcuff him and remove him from the cell. (*Id.* ¶ 34.) Wiley refused to comply with multiple orders to do so. (*Id.*) Instead, Wiley placed soap and water on the floor and raised his fists in a fighting stance when Watson attempted to handcuff him. (*Id.* ¶ 35.)

A lieutenant then ordered Watson to spray Wiley with Oleoresin Capsicum ("O.C.") spray through the chuck hole to gain Wiley's compliance. (*Id.* ¶ 35.) Watson received training

5

on how to use the O.C. spray as part of his training to become a correctional officer. (*Id.* ¶ 36.) Watson used approximately a ½ to 1 second burst of O.C. spray through the chuck hole. (*Id.*) Thereafter, Watson attempted to spray Wiley two other times to gain compliance, however, Wiley placed a mattress in his cell in front of the chuck hole to block the spray and the spray hit the mattress. (*Id.* ¶ 37.)

Sergeant Smith was not present during the initial confrontation nor during the spraying of the O.C. spray on June 11, 2012. (*Id.* ¶ 38.) Thereafter, however, Smith approached Wiley's cell and asked him to place his hands out so they could handcuff Wiley. Wiley, nonetheless, refused and placed his mattress against the cell door. (*Id.* ¶ 39.) Smith then activated the CRT to extract Wiley from his cell. (*Id.* ¶ 40.) At approximately 1:39 p.m., Sergeant Smith once again ordered Wiley to place his hands out the chuck hole so that they could handcuff him, but Wiley refused. (*Id.* ¶ 41.) Smith ordered the CRT to line up outside of Wiley's door and Smith positioned himself with a pepper ball gun. (*Id.* ¶ 42.) At that point, Wiley complied with orders to be handcuffed. (*Id.*) Officers then placed Wiley in a four-point restraint chair for approximately five hours. (*Id.* ¶ 43.) The restraint chair consists of nylon restraints that restrain an inmate at the ankles, wrists, shoulders and waist. (*Id.*) The use of a restraint chair is for the safety and security of the Jail. (*Id.* ¶ 63.) The Jail does not use the restraint chair as punishment. (*Id.* ¶ 64.) In addition, the Jail maintains a policy that medical personnel check restraints to ensure that the restraints allow proper circulation and are not too restrictive. (*Id.* ¶ 44.) Prior to leaving E-Pod, Emergency Medical technician ("EMT") Larkin checked Wiley's restraints and found them to be properly affixed. (*Id.* ¶ 46.)

Staff subsequently transported Wiley to Intake and Release and secured him in cell I-12. (*Id.* ¶ 47.) Jail staff removed Wiley from his cell in E-Pod in order to return the pod to normal operations and avoid any further safety or security concerns with operating the Jail. (*Id.*) Removing Wiley from his cell also removed him from any excess O.C. spray that was in his cell. (*Id.* ¶ 48.) Once in cell I-12, Correctional Officers Hughes and Williams decontaminated Wiley by blotting his face with a wet paper towel and then patting his face with a dry paper towel. (*Id.* ¶ 49.) In addition, EMT Larkin flushed out Wiley's eyes with a solution and excess solution was dried from Wiley's face. (*Id.* ¶ 50.) Further, EMT Larkin checked Wiley's restraints at 2:00 p.m., 3:00 p.m., 4:00 p.m., 5:00 p.m., 6:00 p.m. and 7:00 p.m. (*Id.* ¶ 58.) Wiley refused water from EMT Larkin at the 4:00 p.m., 5:00 p.m. and 6:00 p.m. checks. (*Id.* ¶ 59.) Correctional officers also electronically checked cell I-12 approximately fifteen times while Wiley remained in the restraint. (*Id.* ¶ 65.)

Sergeant Smith held a briefing with members of CRT and wrote a report regarding the incident. (*Id.* ¶ 53.) Smith did not handle any further decisions regarding Wiley or the restraint chair nor his classification status and classification reviews. (*Id.* ¶ 54.) Also, Smith was not aware of any burns or blisters to Wiley's face when he left cell I-12. (*Id.* ¶ 55.) Smith finished his shift the day of the incident at 3:30 p.m. (*Id.* ¶ 56.) Neither Sheriff Perez nor Commander Hunger were aware of or present during the June 11, 2012, incident as it took place, and neither of them ordered the officers to place Wiley in the restraint chair. (R. 53 ¶ 12.)

Sergeant Michael Huston, the Sergeant of Intake/Release, Afternoon Shift, became aware of the incident that occurred with Wiley. (*Id.* ¶ 60.) At approximately 7:40 p.m., Huston spoke with Wiley who was in the restraint chair in cell I-12. (*Id.* ¶ 61.) Wiley assured Huston that he

7

would not become disruptive if Huston removed him from the restraint chair. (*Id.*) Thereafter, staff removed Wiley from restraint chair. (*Id.* ¶ 62.) Wiley had been in the restraint chair for over five hours. (*Id.*)

Once Wiley was removed from the restraint chair, officers escorted him to I-22, a room used for incoming detainees to shower and change their clothing. (*Id.* ¶ 66.) Wiley showered and staff provided him with a new set of clothes. (*Id.*) Staff returned Wiley to cell I-12 and gave him a dinner tray and drink without incident. (*Id.* ¶ 67.) At approximately 9:40 p.m., Sergeant Huston gave Wiley a mattress. (*Id.* ¶ 68.) Although Wiley refused the mattress, it was placed in the cell for his use. (*Id.*)

### C. Jail Classifications

There are three different classifications used at the Jail — green, yellow and red. (*Id.* ¶ 74.) Green status is the least restrictive and allows inmates full privileges. (*Id.*) Yellow status is the next level in which the Jail imposes some restrictions on the inmate's activities. (*Id.*) Red status is the most restrictive status with 23-hour lockdown and one hour recreation time in accordance with Illinois Jail Standards. (*Id.*) Red status inmates may leave their cells, shower, and use the telephone during the one-hour recreation time. (*Id.*)

Placement into red status is not punitive, but rather such placement is an administrative function that is necessary for the safety of the staff, the inmate, and other inmates at the Jail, and for the safe and orderly administration and function of the Jail. (*Id.* ¶ 76.) The Jail's policy precluded inmates on red status from having access to their bedding or mattress during daylight hours to preserve the orderly operations of the Jail. (R. 53 ¶ 16.) While Wiley was on red status, staff members removed his mattress and bedding from his cell between 6:30 and 9:00 a.m., and

returned it to him for overnight use at approximately 10:00 p.m. (*Id.* ¶ 17.) Wiley had access to a mattress and bedding every night he stayed at the Jail and remained free to move about his cell during the day. (*Id.* ¶ 18.) In addition, Placement staff put Wiley on a two-officer, cuff and shackle order, which meant that anytime Wiley departed his cell, two officers escorted him. (*Id.* ¶ 73.) The officers also had to handcuff him at the wrists and place ankle shackles on him.

The Jail placed Wiley on red status in F-Pod after the June 11, 2012, incident. (*Id.* ¶ 75.) Also, Officer Watson wrote a Detainee Disciplinary Ticket for the June 11, 2012, incident. (*Id.* ¶ 77.) The Ticket cited Wiley for the following major infractions — failure to cooperate, refusing direct order, creating a disturbance, threats, and insubordination or disrespect. (*Id.*) It further cited Wiley for the minor infractions of violating rules and insolence. (*Id.*)

After the June 11, 2012 incident, Wiley made requests to see medical personnel through the kiosk computer system. (*Id.* ¶ 78.) Wiley, however, refused medical services on July 2, 2012. (*Id.* ¶ 79.) Wiley never sought treatment for medical reasons regarding weight loss, depression or insomnia, and never sought professional psychiatric services. (*Id.* ¶ 80.) Wiley never received treatment for emotional anxiety, weight loss, insomnia or serious depression since June 11, 2012. (*Id.*)

### D. Grievance Procedures

The Jail has a grievance procedure for all detainees and inmates. (R. 53 ¶ 21.) Detainees must file grievances in writing and within forty-eight hours of the alleged offense unless the detainee can show good cause for the delay. (*Id.* ¶ 22.) The detainee's grievance must include the date and time of the alleged offense, the location of the alleged offense, all parties involved, the nature of the alleged offense with a short explanation of the alleged offense, and the

detainee's name, signature and booking number. (*Id.* ¶ 23.) The Jail acknowledges grievances within fifteen days of receipt unless circumstances require additional time. (*Id.* ¶ 24.) If additional time is needed, the Jail will send a written response to the detainee stating why additional time is needed and an expected completion date. (*Id.* ¶ 25.) Detainees then receive one level of appeal for any grievance decision. (*Id.* ¶ 26.) The detainee must file an appeal within forty-eight hours of the final grievance decision. (*Id.*) Also, the detainee must provide a valid reason for the appeal. (*Id.*) The appeal is forwarded to the Commander of Corrections. (*Id.*)

Up until the summer of 2012, the Jail provided detainees with a paper grievance form that detainees had to use to submit a grievance. (*Id.* ¶ 27.) The Jail also maintained detainee request slip forms that detainees could use to make requests to Medical, the Classification Unit, and a number of other people or units. (*Id.* ¶ 28.) In the summer of 2012, the Jail implemented a computer kiosk system by which detainees could electronically make various requests and file grievances. (*Id.* ¶ 29.) Detainees could also access the Detainee Handbook via the kiosk. (*Id.* ¶ 30.) Each pod or housing unit in the Jail had a touchscreen computer that a detainee could use. (*Id.*) All grievances submitted via the kiosk went to Lieutenant Wayne Carter. (*Id.* ¶ 32.) Carter could type a response to the inmate which the inmate could access via the kiosk. (*Id.*) An inmate could then appeal the response via the kiosk. (*Id.*) In addition to the kiosk, detainees could also obtain paper grievances and request forms. (*Id.*) Jail personnel gave Wiley access to the computer kiosk system and an inmate handbook when he entered the Jail. (R. 71 ¶ 5.)

### E. Wiley's Grievances

Wiley submitted a paper grievance on June 11, 2012, pertaining to Correctional Officer Nelson being disrespectful to him. (R. 57 ¶ 21.) Lieutenant Carter responded to the grievance on June 19, 2012. (*Id.*) Wiley did not appeal the response to the grievance. (*Id.* ¶ 22.) On or about June 15, 2012, Wiley submitted a grievance pertaining to his mattress being removed from his cell for up to six hours a day. (*Id.* ¶ 23.) On June 24, 2012, Wiley submitted a request via the kiosk regarding his previous grievance pertaining to his mattress being removed from his cell. (R. 71 ¶ 74.) The response to the request from "njones" indicated that "these are the disciplinary measures that are taken." (*Id.*) On June 28, 2012, Lieutenant Carter responded to the June 15th grievance, indicating that the "procedure is not intended as punishment and will not change." (R. 57 ¶ 23.) Wiley did not appeal the response to this grievance. (*Id.* ¶ 24.)

On July 28, 2012, Wiley submitted two grievances pertaining to unprofessional and racial comments made by some correctional staff. (*Id.* ¶¶ 25-26.) On July 29, 2012, Wiley submitted a grievance regarding his shower restrictions while on red status and recreation restrictions. (*Id.* ¶ 27.) Lieutenant Carter responded to the three grievances and Wiley did not appeal the response to any of the three grievances. (*Id.* ¶¶ 28-29.)

On November 9, 2012, Wiley submitted a grievance pertaining to the June 11, 2012, incident. (*Id.* ¶ 19.) Lieutenant Carter responded to the grievance on November 14, 2012, indicating that, "All incidents of this nature are fully reviewed. This incident is no exception. All actions taken were not of a punitive nature and were necessary to maintain the safety and security of this facility." (*Id.* ¶ 20.) Wiley did not appeal the response to this grievance. (*Id.*)

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed.2d 202 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed.2d 686 (2007). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L. Ed.2d 265 (1986). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 255 (quotation omitted).

## ANALYSIS

Wiley has sued Sergeant Smith for violating the Eighth Amendment based on the prolonged period of time he was in the restraint chair, the alleged denial of a shower and a request to use the restroom after the officers sprayed him with the O.C. spray, and for being placed in a "dry cell" for two days that did not have running water, a toilet, or a bed. Wiley has sued Sheriff Perez and Commander Hunger for violating the Eighth Amendment based on the policy of removing his mattress from his cell during the day. Defendants have moved for summary judgment arguing that Wiley failed to exhaust his administrative remedies.

Exhaustion of administrative remedies, pursuant to the Prison Litigation Reform Act, is required for all prisoner/detainee suits seeking redress for prison circumstances or occurrences, regardless of whether they involve general circumstances of incarceration or particular episodes. *See Porter v. Nussle*, 534 U.S. 516, 525 (2002); *Fletcher v. Menard Corr. Ctr.,* 623 F.3d 171, 1173 (7th Cir. 2010). Under 42 U.S.C. § 1997e(a), courts can dismiss lawsuits brought with respect to prison conditions if the court determines that a plaintiff has failed to exhaust his administrative remedies. *See Fluker v. County of Kankakee,* 741 F.3d 787, 791 (7th Cir. 2013); *Perez v. Wisconsin Dept. of Corr.,* 182 F.3d 532, 536-37 (7th Cir. 1999).

A detainee must take all the steps required by the institution's grievance system to exhaust his administrative remedies properly. *See Turley v. Rednour,* 729 F.3d 645, 649 (7th Cir. 2013); *Pozo v. McCaughtry*, 286 F.3d 1022, 1023-24 (7th Cir. 2002). To exhaust remedies under § 1997e(a), a prisoner "must file complaints and appeals in the place, and at the time, the prison's administrative rules require." *Pozo*, 286 F.3d at 1025; *see also Woodford v. Ngo,* 548 U.S. 81, 95 (2006). The exhaustion requirement gives corrections officials the opportunity to address complaints internally before a federal suit is initiated. *See Porter*, 534 U.S. at 524-25.

Even viewing the facts and all reasonable inferences in the light most favorable to Wiley, Defendants have demonstrated that Wiley did not his exhaust his administrative remedies for the claims raised in his Amended Complaint. While Wiley filed a late grievance regarding the June 11, 2012, incident, and a grievance regarding the removal of his mattress during the day, he did not appeal the response to either grievance as required by the grievance procedure set forth on the grievance form. Wiley argues that the handbook he received did not require that he appeal the denial of his grievance. The procedure that Wiley relies on in the handbook, however,

13

pertains to grieving a disagreement with the verdict of a disciplinary board on a rule violation. The section Wiley refers to is clearly under the "Detainee Discipline" section and applies only to grieving the verdict of a disciplinary board on a rule violation. *See* R. 71, Exh. 4-D.

Wiley does not dispute that the handwritten grievance forms that he signed and submitted included the requirement that an inmate file an appeal within fourteen days of receipt of the original decision. *See* R. 58, Exh. 6-G, G-H. Nor does Wiley dispute that he did not file an appeal for any of the relevant grievances. Indeed, no genuine issue of material fact exists as to Wiley's failure to exhaust his administrative remedies by failing to appeal the decisions of those grievances. *See Celotex Corp.,* 477 U.S. at 323; Fed.R.Civ.P. 56(a). Accordingly, the Court grants Defendants' summary judgment motions based on Wiley's failure to exhaust his administrative remedies. Because Defendants have demonstrated that Wiley failed to exhaust his administrative remedies as to all of his claims, the Court need not address the merits of his claims. *See Fluker,* 741 F.3d at 791.

For the foregoing reasons, the Court grants Defendants' motions for summary judgment based on Wiley's fail to exhaust his administrative remedies. Although the time for submitting a grievance has expired per the Cook County Department of Correction's policies, the dismissal of Wiley's claim is without prejudice, as this Court does not rule on whether a state court would apply an exhaustion requirement similar to that of § 1997e(a) with respect to Wiley's claims. *See Ford v. Johnson*, 362 F.3d 395, 401 (7th Cir. 2004) (for that reason, "all dismissals under § 1997e(a) should be without prejudice"). In short, the Court's ruling does not preclude Wiley from pursuing any relief that may be available to him through the state court. Nonetheless, by operation of § 1997e(a), Wiley has no further recourse in federal court, and thus the dismissal

without prejudice constitutes a final, appealable order. *See Maddox v. Love*, 655 F.3d 709, 716 (7th Cir. 2011) (order dismissing § 1983 claims for failure to exhaust administrative remedies is appealable where there are no further remedies that plaintiff can pursue); *Barnes v. Briley*, 420 F.3d 673, 676 (7th Cir. 2005) (same).

If Wiley wishes to appeal this final order, he may file a notice of appeal with this Court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* should set forth the issues Wiley plans to present on appeal. *See* Fed. R. App. P. 24(a)(1)(C). If Wiley does choose to appeal, he will be liable for the $505.00 appellate filing fee irrespective of the outcome of the appeal. *See Evans v. Illinois Dept. of Corr.*, 150 F.3d 810, 812 (7th Cir. 1998). Furthermore, if the appeal is found to be non-meritorious, Wiley may also be assessed a "strike" under 28 U.S.C. § 1915(g). *See Gay v. Chandra,* 682 F.3d 590, 595 (7th Cir. 2012). The Court warns Wiley that, pursuant to that statute, if a prisoner has had a total of three federal cases or appeals dismissed as frivolous, malicious, or failing to state a claim, he may not file suit in federal court without prepaying the filing fee unless he is in imminent danger of serious physical injury. *See Robinson v. Sherrod,* 631 F.3d 839, 843 (7th Cir. 2011).

## CONCLUSION

For these reasons, the Court grants Defendants' motions for summary judgment [R. 50, 54]. The Court dismisses Plaintiff's complaint without prejudice pursuant to 42 U.S.C. § 1997e(a). Civil case is terminated.

**Dated:** August 6, 2014

                                            **ENTERED**

                                            _____
                                            **AMY J. ST. EVE**
                                            **United States District Judge**